May it please the Court, I'm William Kopenny, Counsel for Appellant Tran. We've agreed among ourselves that I would, on Mr. Tran's behalf, take five minutes, that Mr. Aw, AU's counsel, will take seven minutes, Mr. Melcher will take an appropriate additional amount of time, and we're hoping to reserve three or four minutes for rebuttal. We also have sort of divided up how we're going to address the issues with the Court's permission. I'd like to speak primarily about our first issue, which is the vouching question, and then possibly address the question of the improper expert testimony. The government really has taken a position, I think both sides have fairly well briefed, the cases that apply to this question of vouching where the allegation has to do with the use of a plea agreement. However, it seems to the appellant that the government's argument is that using the government's position with respect to a cooperating witness and telling the jury that the government gets to decide whether he's telling the truth, and then implying to the jury that he is telling the truth by virtue of explicating the terms of a plea agreement, would be impermissible vouching that violates due process unless the defendant attacks the credibility of that witness. Mr. Copeland, this is a great argument to make on behalf of Mr. Tran, but as I see the problem, the problem is that Mr. Harley aggressively went after the government's witness. Was it Mr. David? Was that his name? David Wynn is the one. Yes, Your Honor. And so the problem that it seemed to me the other co-defendants are faced with is if we decide that Mr. Harley opened the door, then it's not improper vouching, at least as regards to Mr. Harley's client, Mr. Dang. And under our case law, it comes in. Even though had you been able to restrain your co-counsel, you wouldn't have gone quite as far as he did in going after the issue that opened the door on this. Well, Your Honor, I appreciate the Court's distinguishing among the opponents, but the argument that I'm making orally here is really whether or not it is correct that what is a denial of due process, what is unfair vouching, becomes fair game when all that happens is the defense attacks the credibility of the witness. But it's more than that. I mean, our case law recognizes that where a defense lawyer essentially goes after the motivation of the witness for testifying and, as Mr. Harley did, goes into a fairly extensive cross-examination of the understanding that David Wynn had with the government as to what the plea agreement consisted of, that when that happens, then it's proper on redirect for the government to get up and respond. And it looked to me from reading the transcript that that's what happened here. Well, Your Honor, in my reply brief, I think I showed pretty carefully how what the government did was not merely respond, but to show the jury that it was up to the government to decide whether Mr. Wynn, David Wynn, the witness we're talking about here, was telling the truth. And it — How did that happen? Well, Your Honor — Do you have a testimony there? Your Honor, I recite the testimony. And there were a number of questions that the United States attorney asked. And they're set out at pages — well, they're set out in the second and third page of that argument. I'll just briefly refer to them here. First, the government says to Mr. Wynn, so your agreement is with the government. And I've emphasized that. Do you understand this agreement requires you to be truthful at all times? That's sort of neutral. But then do you understand that the plea agreement requires you to be truthful with the government? Do you understand what will happen to you if the government concludes that you have not been truthful? These things have nothing to do with the obligation to be truthful, but it emphasizes that I, the embodiment of the government in this courtroom, have to be convinced that you're telling the truth. And when the prosecutor then argues to the jury that, in fact, this person is telling the truth, that's where I think we get into the impermissible vouching. So it isn't just a case, Your Honor, Judge Tolman, of informing the jury about the plea agreement being the motive, but informing the jury that he has to convince the government and then arguing that he's credible. Well, let me come at it a different way. Assuming that I read the transcript correctly and where the cross-examination was based literally paragraph by paragraph on the terms of the plea agreement, why wouldn't the government have been within its rights to simply ask for the admission of the plea agreement under the rule of completeness in order to let the jury look at those provisions, which includes a paragraph that specifically says, talks about being truthful in the eyes of the government? Well, Your Honor, I think the answer is in the language of the Weatherspoon case, which I cite in my reply brief, which says that this argument by the government that what would be improper is proper when it's fair response to the defense conduct. Objected to the admission of the plea agreement at that point. Well, Your Honor, I think that's incorrect. I think in my opening brief I point out that there was an objection to the admission of the plea agreement. May I check to see? Sure. I think the appellant's objection to the admission of the plea agreement was overruled at pages 232 and 233 of the reporter's transcript on September 23rd of 2004. I don't have that before me, but I have my reference to it in my brief. Also, I wanted to point out here that in the Weatherspoon case what they seem to say is that merely doing what is appropriate testing of the credibility of a witness does not constitute improper attacking of the victim that draws an improper – what would otherwise be an improper response. And I think there's some tension between that recent Weatherspoon case and this, what Your Honor has referred to as established law in the circuit. And that's what I point out in my reply brief. But it's a fine line, is it not? I mean, the defense counsel is running the risk that if you go too far, you open the proverbial door, and the trial judge has to decide when the objection is made whether or not that door has been opened. Your Honor, it is a fine line, but I think that's what appellate courts specialize in, is determining whether when a judge makes a decision he's made the wrong one in terms of whether that line has been crossed. So is the standard, whether we view the evidentiary ruling as an abuse of discretion or do you think it's de novo review? Well, Your Honor, I think because it's a due process issue, I think it's a de novo review, but I think that every time a ruling permits what the Court says is unfair conduct by the government, I think every time that ruling would be an abuse of discretion as well. So I think that the – So it's both? I think that every violation of due process dictated in an evidentiary ruling is an abuse of discretion. So I don't think it's necessarily both, but I think that it doesn't much matter. I understand your point. I mean, obviously, if it's a violation of due process, it has to be an abuse of discretion. Right. And what I'm arguing, I'm asking the Court to consider is whether the holding in Witherspoon doesn't say the government can't any longer sort of get away with saying, well, it was fair response. And that's what – and that's what I think happened here. I think that the – because I've used so much of my time, the only other comment I'd like to make is the government doesn't respond at all in their briefs to our point, which is that once the government was permitted to go over the plea agreement, show the jury that it meant that the government's prosecutor believed Mr. Wynn, the defense then asked, at page 237 of the September 23 transcript, to then further cross-examine the witness about that. And the Court denied that request. So we not – okay. There was extensive attack on credibility of a government witness. The government then did what I consider to be vouching. And then in order to try to come back to show why this witness is still not credible, the defense was denied that. And I think – I think the combination of those things make the record here an example of an unfair – What was the question on recross? Well, Your Honor, I don't have the question. I just have a cite to the fact that there was an attempt to continue probing Wynn's credibility in light of his plea agreement, which the government had just – Was there a proffer as to what the questions would have been? I don't believe there was a proffer, Your Honor, although Mr. Harley was trial counsel in this case. He might recall. Well, he might remember. Okay. All right. I'm sorry. I'm so over time that I'll leave unless you have questions on the issue of the expert witness testifying about the ultimate fact. I'll just submit. Thank you. All right. Rob Harley for Appellant Kung Au. I apologize to the co-counsel for perhaps scuttling a good appellate argument. But I'm just going to be focusing in a drug accountability finding that was submitted as a separate finding and was not an element of offense as proposed by the prosecutor in this case. And I realize that since this 2004 trial took place, United States versus Kilby in 2006, you know, changed the rules. A judge can make the determination by preponderance of the evidence. But I'm arguing that that's not the proper standard for this appeal. It's still a jury finding of proof beyond a reasonable doubt. And I'm conceding backwards, forwards, any way I can that there was proof beyond a reasonable doubt of the 846 violation. No question about that. But I'm arguing there's insufficient evidence as a matter of law to support the finding, the drug quantity finding, because I recognize Shabani eliminated any overt act requirement, any type of conduct requirement. But Shabani never talked about or discussed the guidelines application or the relevant conduct that appears in the guidelines. And as we know now, the guidelines of the sentencing accountability process is much narrower than the conspiracy liability. And Well, now let me get this straight, Mr. Harley. Okay. The indictment charged Al with possession with intent to distribute, I think that was it. Yes, sir. More than 500 grams. Yes, sir. Tran with more than 1.5 kilograms. Yes, sir. And the same for Dang. Yes. That was charged by the indictment. That was found by the jury. It was found. Yes, sir. So I thought you were arguing that the jury did not find the necessary amounts to support the sentence that was given or to convict him of the allegations in the indictment. I'm arguing there's insufficient evidence because all they have is wiretap evidence. The telephone conversations that they had. Yes, sir. Yes. People are talking about the drugs and one girl or two girls or whatever it was. That's correct. And then they had that interpreted. That's correct. And it seemed if you put all that together, you build up more than 500 for Al and more than 1.5 kilograms for the other two. Oh, I'm conceding based on the wiretap evidence by itself. Yes, there's a lot of drugs being discussed. So there's something wrong with the wiretap evidence? Is that it? Oh, no, sir. I'm just saying there has to be something more than verbal conversations captured by a wiretap. There's got to be some conduct, i.e., payo sheets, a drug lab. You know, a lot of this stuff is mentioned in the indictment. This was a conspiracy. Now it's becoming clearer to me. Yes, sir. This was a conspiracy, so you need evidence of an agreement. But you argued that you need some sort of conduct of a drug dealing of some kind. Is that it? Precisely. Even though it's only a conspiracy? Only. Even though it's a conspiracy charge? If it was an 846 by itself, they wouldn't need anything else. But when the government opted to make that finding, which they agreed was not an element of the conspiracy offense, they needed something more. They need conduct. They need something more than mere words captured on that wiretap or all those wiretaps. Conduct is the agreement, isn't that it? No. My argument is the agreement itself is not the conduct. There has to be. Shabani makes that clear, you know, as far as eliminating any overt act requirement. I analogize the overt act requirement that appears in Shabani as synonymous with conduct that appears or acts on omissions that appear in the guideline calculations when you get to be approximating the drug quantities involved. So a mere fact that conspiracy has been proven beyond any shadow of a doubt is insufficient standing alone to support any drug quantities that are attributed to the individual. That's what you argued in your brief. Yes. When you started out, I thought you were arguing something else. But that's the argument you set forth in your brief. And if I was unclear, that's still my argument. Yes. Okay. And I'm just arguing there's language in the guidelines and also the commentary notes that appear to back me up because they refer to the two prongs, the aiding and abetting prong. And these are both the prongs set out in the guidelines, 1B, 1.3A. And the 1A prong is the aiding and abetting prong. And the 1B prong is the conduct amounting to a reasonably foreseeable act and furtherance of the conspiracy prong. And it requires acts, omissions. And if you read some of the commentary in the guidelines, acts and omissions are synonymous with conduct. You don't have to prove conduct to prove an H-486 violation. My whole argument is you have to prove some sort of conduct in order to stick these individuals with the quantities that they were stuck with by the jury determination. And my argument, again, I think is supported by the commentary, which talks about the requirement of reasonable foreseeability. And I'm reading this straight from the guidelines. The requirement of reasonable foreseeability applies only in respect to the conduct. And then it says, i.e., acts and omissions. But why can't the jury find the conduct from the fact that, you know, after they were heard on the wiretaps talking about cooking meth or whatever it was, that the evidence was that the defendants then went out and solicited people to buy and then reported back as to whether or not they had ready customers available and how much they wanted. You're saying, well, but that's still on the wiretap. Well, if it's on the wiretap, the government's obligation is to prove some objective conduct out there to support the drug quantities that are being attributed to the individual. And I guess what I'm asking is why can't the jury listen to those portions? What, 13,000 calls intercepted in this Title III? Yes. Okay. Why can't the jury then consider that, and assuming that they believe that the person is truthful on the wiretap, that he actually did go around and solicit customers and conclude that that's the conduct that you say, even though they don't have to show it as an overt act in furtherance of the conspiracy, why can't the jury conclude that that's, in fact, what happened? Well, I think, I mean, if this was a regular type conspiracy, the government would have to prove an overt act. And I'm, I mean, if the court disagrees with me and these conversations caught in a wiretap are insufficient, I lose. But I think there's got to be something out there besides these wiretaps and then Agent Fintas and Agent Madden's opinion that based on my expert opinion, they're talking about certain quantities, and based on my expert opinion, a drug transaction took place. That was objected to, even the prosecution. Wasn't there also testimony by co-conspirators as to what happened? I mean, it's more than just wire evidence, is it not? Well, there's testimony by co-conspirators, but a lot of that, like there's a lab that was developed. That came up in October 2003, long after the government proceeded on a theory that my client had 500 milligrams or more of his substance-containing methamphetamine attributed to him based on three phone conversations, excuse me, a multiple of phone conversations that took place August 12th, August 12th to 27th. It sounds to me that what you're saying is we recognize it's a dopeless conspiracy because no drugs were seized. So this is outside, it's not unheard of, but they're unusual. And there was a search of a lab site, but it occurred at the end of the conspiracy and not at the beginning when amounts were attributed to your client. That's correct. That lab that was developed was not attributed to my client in any way, shape, or form. No, but as I understood the government's theory, because of the fact that they found the lab in October and they had the co-conspirators testifying as to the quantities that were being produced out of that lab, that the jury would be allowed to infer that the lab had been cooking for some period of time, which corroborates what the jury heard on the wiretaps. Is that what the government argued? Well, I reviewed the argument, and I didn't say it. I mean, they just talked very briefly about foreseeability and foreseeability. If you listen to the conversations by my client with HIPWIN, it's reasonably foreseeable there would certainly be more than 500 milligrams of methamphetamine involved. Boom, that's it. No mention of that drug lab that was found in October. But that's certainly what they argued in their brief, unless I misread their brief. Well, I didn't really see it that pronounced. I'm addressing the court's question to the final argument by Ms. Flynn down below, where she spells out everything and mentions reasonable foreseeability. I mean, it sounds to me that what your argument comes down to is unless they have physical evidence from the beginning, from August in this case, then as a matter of law, we should declare that you can't just base it on testimony of the co-conspirators and what the jury heard on the wiretaps, and on the physical evidence that was found from the lab at the end of the drug conspiracy. No, I'm conceding if a co-conspirator came up and testified that those conversations my client had, you know, resulted in some conduct, that could be considered. But none of the co-conspirators did that. Two of the three co-conspirators, excuse me, I'm talking about the people that were granted immunity, the cooperators, didn't even know my client. The only guy that certainly knew my client was, well, the person I got in a plea agreement with, unfortunately. But he was only able to say there were some conversations he had about some unknown drugs in a time period that was completely irrelevant to my client. I think it was before he went back to Oklahoma. And then that particular co-conspirator was in jail from April of 2002 until September of 2002. So he wasn't around my client during a relevant period of time when I'm asking for some sort of proof of an affirmative act conduct. It's objectively verifiable, not conversations that occur or are captured on a wiretap. I'm just looking for something that you can lay your eyes on and identify as concrete evidence, i.e. conduct, as that's spelled out in the guidelines. Was there surveillance here? Were people watched going and coming from different places? There was surveillance. And the only surveillance that could have been, it certainly didn't tie into my client. I'll concede that some police reports I read indicated my client showed up at a budget-rented car, a national-rented car, enterprise-rented car, but I reviewed the transcript and it didn't become very clear from the investigating officers or the surveilling officer that that third unidentified male agent who was seen with hip winds showing up at the budget or enterprise-rented car was, in fact, my client. Now, sure, if they proved, yes, that was a guy, that would be something objective, concrete, that falls within the parameters of conduct as I define that term, which is supported by my interpretations of the guidelines. But there's none of that. What you're really saying is there has to be some direct evidence that links your client specifically, and it has to be something more than listening to him talk on the wiretaps or people talk about what he's doing on the wiretaps. Well, I'll give this to government, even circumstantial evidence, as long as it's objective and concrete, something you can eyeball, not something you hear over a wiretap. There's got to be something else, direct, circumstantial, something that qualifies as conduct as opposed to mere conversation. This sounds to me kind of an interesting argument. What case would you support to us that we would rely on, or is this it? Well, Your Honor, unfortunately, I can't find any, but I'm just arguing on some of the plain language of the guidelines, and when you look at the approximation tables in 2D1.1, where it says where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court can approximate, and then they can consider. For example, it's not an exhaustive list, but the price generally obtained for the controlled substance. Well, that to me means something was testified to during the course of the trial on prior dope deals, you know, the normal price. Well, then you can use that as a standard, a starting point, in order to abase this approximation problem. I thought there was testimony. I mean, there was reference to price on the tapes and then evidence or testimony by the agents as to what that equated to. Yes, but there is price all over those wiretaps, and then the agents. Well, in my opinion, this is what I mean, but that's the type of stuff that I don't classify as conduct, which is required in order to prove up, beyond a reasonable doubt, the drug quantity determination. Sure, an agent can get up there. Well, in my opinion, there's a bunch of drug dealing going on, and based on what I heard Kung Al say to Hick Win, yeah, I would say there's a couple boats, a couple girls that were sold for $2,000 or $3,000. Yes, that's my opinion. But that's not the conduct that I feel should be required in proving it up beyond a reasonable doubt. Now it's by preponderance of the evidence, but back then, beyond a reasonable doubt, necessary over and above the mere conviction for an 846 violation. And obviously the Court feels I'm wrong. I lose, but that's the foundation of my argument. And other than that, I'm prepared to submit unless the Court has questions. All right. Thank you very much. Thank you. W.C. Melcher of Melcher, Melcher, and Melcher. We have the pleasure of representing Nathan Dang upon appointment by this Honorable Court. Which Melcher are you? I'm the last one. I'm going to be the first one to fall off and go to Florida in a few more years. As soon as my grandson joins us, they'll be back to three Melchers again. What do you have, your father, the son, and the grandson? And the Holy Ghost. No, actually, it's the father. One of us is the father, and we have two sons. So it's Bill and Chris, and we're blessed with a grandchild who is six years old, and he's well on his way, unless I can perhaps steer him otherwise. But it's been an exciting career for me of 37 years. The fair also always, in a case like this, we have a nine-day jury trial. It's an exceedingly difficult prosecution. Never seen anything more complicated than this. 13,000 interceptions, and they're in Vietnamese and English. We have a very exasperated interpreter trying to figure out what was said. Not only do we talk about girls and spoons and half spoons and part of a spoon, point of a spoon, we have northern Vietnamese and southern Vietnamese accents now, different dialects. But we have some complex jury instructions. The fact that this particular defendant, Dang, didn't testify, there's always a fear that everybody, or at least somebody, is going to be swept away with the same broad brush. On Mr. Dang's part, we made several points, and I'll be very brief. I know the court's read our brief and our reply brief. We tried to restrict what our argument was. We certainly adopt what Learned Counsel has said. On the three pounds, there were two different transactions or contacts that Mr. Dang is said to have had with this entire conspiracy. And the first dealt with one pound, leaving that alone for a minute. The other was three pounds. And our argument was in that regard, that the only inquiry or the only discussion of that was on 825.02, where there was some question by Dang or some discussion as to price and availability, and then nothing further. And then on 926.02, there was, shall we say, an argument or some grumbling by Dang, saying, you know, you told me about this three girls or three pounds, and you didn't leave me any. I'm your cousin. You didn't leave me any. So it certainly appeared clear, and I wasn't one of the trial attorneys, but it certainly appeared clear for me from a reading of the cold transcript that three pounds was never consummated or ever discussed again, except by way of grumbling. We have the other matter being, I'm sorry, then we have, of course, Gibbs. Gibbs talking about, sure, wiretaps are great. You know, there's nothing wrong with wiretaps, and you can certainly build a case on wiretaps, and we can estimate quantities of dope. We can talk about intercepted code language calls. But in a similar situation as in Dang here on the three pounds, the court in Gibbs in the Third Circuit found that it was much too speculative that a deal had been consummated there. And, in fact, whereas in Gibbs the judge said, rather, the court of appeals said it's much too speculative to determine or assess whether or not a deal had been consummated, in our case we seem to know that a deal had not been consummated on that three pounds because it was grumbling about it later saying, hey, I'm your, what, cousin, and I didn't get any. You pushed it all off somewhere else. And I do point out, too, that the Gibbs case, of course, was a conspiracy case such as is this. The conspiracy case seemed to fall apart. I don't know. In this case, when the court, we're stuck between Blakely and Booker. We've got Blakely just having come down. We've got Booker coming down sometime. And the court apparently wanted to give a jury instruction that was going to be consistent with the state of the law under Blakely, but in doing so seemed to considerably limit or restrict or narrow the type of conduct for which a guy could be, you know, into an aiding and abetting case. And in the jury instructions in our opening brief, we point this out on page 27, basically saying that a defendant is responsible for conduct, you know, if he, number one, if he does it, but number two, if he aids and abets, not talking about going into conspiracy. So in this particular case, it can't be an issue. Doesn't that help you? I mean, aiding and abetting liability in that respect is better than Pinkerton liability, is it? Well, I think aiding and abetting liability requires a completed act. That's what I'm saying. Sure. I like that. I'm saying the instruction that you're giving is actually, that you're complaining about is actually better than. No, no, I'm not complaining. Okay. I'm not complaining at all. Oh, all right. I misunderstood your argument. I'm sorry, Judge. It limited the type of conduct upon which Dang or anyone presumably could be found responsible. We've taken enough time. I see I'm well over with our ‑‑ if I have any time left, which I don't think I do, I'd reserve it unless the Court has some questions. Thank you. All right. Thank you. Thank you. Good morning, Your Honors. May I please support Doug McCormick as the United States Attorney for the government? Let me first note by correcting a mistake I made in the government's answering brief, I stated that only one of the defendants moved for a judgment of acquittal. That was incorrect. One defendant moved and the other two joined. So that statement in the government's answering brief is incorrect, and I want to make sure the Court has that correct before it disposes of the case. That relates to the sufficiency of the evidence point. At what point did they all ‑‑ did they do that after all the evidence was in before the case went to the jury? After the case went to the jury. After the case went to the jury. Correct. Correct. But after all the evidence was in, Your Honor. I want to start by addressing Mr. Copenny's argument, which was about the vouching, and Judge Tolman raised the issue of what exactly happened during David Winn's testimony, and I want to direct the Court's attention to the pages of the excerpts that show that. Starting at page 642 of Mr. Au's excerpts of record, that's page 206 of that particular day's transcript, Mr. Harley asked, The plea agreement you signed says that the government in its exclusive judgment determines whether or not you complied with your obligations of telling the truth. Correct? And Mr. Winn answered yes. Then Mr. Harley went on to, as Judge Tolman pointed out, introduce the fact that Mr. Winn had pleaded guilty to a crime with a mandatory minimum, that he acknowledged that he wanted to get out of jail as fast as possible, that he could receive from the government a motion to get him underneath the mandatory minimum sentence of 10 years, and even suggested that he might receive a sentence of time served. Then the government did, on redirect, what the Ninth Circuit, this Court has said, in a long line of cases from the 80s and 90s, it could do. It introduced the plea agreement, and it introduced a truthfulness provision of the plea agreement, even though Mr. Harley had already referenced it. We introduced the plea agreement. We asked David Winn about the provisions of the plea agreement, and we asked him about the requirement that he be truthful, and we asked him if he understood the consequences if he wasn't truthful. And Mr. Harley came back on recross, and he again asked further questions, and he asked whether, and this is at page 671 of Mr. Au's excerpts of record, whether the plea agreement provided for the defense to have any input about whether Mr. Winn was being truthful, and Mr. Winn allowed that it did not. And I finally want to address Mr. Copenny's point that Mr. Harley's cross-examination of Mr. Winn about the consequences of the plea agreement was cut off. This is Mr. Harley's final set of questions. Question. Does your behavior or demeanor change in any way, shape, or form based on whether you were lying or telling the truth? Answer. I really don't know. Question. Is there anything you can share with us that we can look at, that we can look for to make that determination when we're evaluating your credibility? I don't know. Question. Absolutely nothing that you can share with us. Mr. McCormick. Objection. Asked and answered, Your Honor. The court sustained. Mr. Harley. I have nothing further, Your Honor. I think it's a fair reading of that excerpt that I objected to asked and answered because he'd asked the question twice, and that's an asked and answered objection. It wasn't cutting off or foreclosing additional questions on that, and, in fact, there were no additional questions. So I just don't think Mr. Copenny's correct when he states that Mr. Harley's cross-examination on this point was cut off unfairly. Let me also address Mr. Copenny's point that Weatherspoon has changed the landscape of the invited air doctrine. To some extent, I think that's probably correct. Weatherspoon rejected the government's effort to invoke the invited response doctrine, and it basically said, you know, the government, while you can up certain situations where you're invited, the defense opens the door, you're invited to make a response. Here, the government prosecutor went too far, and you'll recall Weatherspoon has a case about improper closing argument, and the closing argument in that case is littered with textbook examples of way over the line vouching by the AUSA in that case. Here, the government did something more narrow, something recognized by a long line of Ninth Circuit cases. It asked the defendant about a truthfulness provision that Mr. Harley had already raised with him, and put forth the fact that the benefits of the plea agreement were predicated on truthful testimony. And again, Mr. Harley came back and fairly and correctly pointed out on recross that it was the government that would determine whether he would get those benefits. There was nothing in the record in which the government represents either during that cross-examination or an argument that made a personal assurance as to the integrity or the truthfulness of this witness, and there was nothing in the argument where the government suggested that there was some sort of extra record evidence that would suggest that the defendant was being truthful. Let me return then to the other argument that was raised here today, which is the sufficiency of the evidence to support the jury's findings of drug quantity. And in preparing for this argument, you know, I think when you're preparing the government's answering brief, you're simply reacting to the arguments that come at you in the opening briefs, and now I think six or seven months later, it occurs to me that maybe this is much ado about nothing, and I'm not sure. It's a unique posture for this case. As Mr. Melcher pointed out, this case was tried in September of 2004, and that was during the period between the Supreme Court's decision in Blakely and the Supreme Court's decision in Booker. Because of that uncertainty, and frankly, Your Honors, there wasn't a lot of cases tried in that period because of the uncertainty, but because of that uncertainty, the government alleged in the indictment and submitted to the jury by proof beyond a reasonable doubt the issue of drug quantity to establish a guidelines offense level. Now, it's clear now, 2006, almost, well, more than two years later, that submitting the issue of guideline drug quantity to the jury beyond a reasonable doubt wasn't necessary. The court's made that clear in its Kilby decision earlier this year. So what does that mean looking back two years ago when we did something that now we clearly didn't need to do? And it occurred to me looking at this fresh that there isn't an apprendee issue here. The defendants were all sentenced within a statutory maximum of 20 years that would have applied, absent some sort of finding. None of these defendants were submitted sentenced to a mandatory minimum sentence. And at sentencing, for all three defendants, Judge Carney, the district judge, made a finding of drug quantity when he adopted the findings of the PSR and assumedly, he didn't say so, but he assumedly did so by at least a preponderance of the evidence. None of the defendants objected to the PSR's findings and none of them attempted to litigate drug quantity. So I guess what I'm wondering whether, this is something I said, just occurred to me in preparing for this argument, whether all these issues about the jury's determination of drug quantity is now, if not irrelevant, at least harmless in light of the Judge Carney's findings at sentence. But what if the jury was right? What if they determined these, the quantity, they determined it beyond a reasonable doubt and the evidence was sufficient for that finding? Well, then I'm thrilled and I'll get to the sufficiency of the evidence in a minute because I do believe, and I'm not conceding for one second, that the evidence wasn't sufficient. The evidence was sufficient. Maybe you ought to move on. Thank you, Your Honor. Let's turn then to the instructions that were given to the jury. And I think one of the issues here is we need to separate between the instructions that were given for liability and the instructions that were given when it came time to finding drug quantity. The jury was instructed the appropriate instructions for finding whether the defendants were guilty of count one of the third superseding indictment, which was 846, liability. And then the court instructed the jurors, if you find a defendant guilty of count one, you then have to find whether the defendant is accountable for drug quantity. And to do that, I'm going to instruct you and give some further instructions. It says the defendant is responsible for conduct if the defendant personally committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused the conduct. That's the aiding and abetting language. Additionally, in the case of jointly undertaken criminal activity, the defendant is responsible for all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity. And that, Your Honors, that's the language the government relied on with respect to these three defendants at trial. That they were responsible for the acts and omissions of the other participants in this drug trafficking conspiracy to the extent that the wiretap telephone calls and the other evidence showed them conspiring with those defendants to traffic or distribute methamphetamine quantities. So then we turn to the question, was the evidence sufficient? And again, the standard here is the court has to view the evidence in the light most favorable to the government. The jury heard cooperating witnesses, four of them, Shreeman Lee, David Wynn, Tim Byrne, Margarito Martinez. The four of them told the jury in significant detail about the drug trafficking activity of the lead defendant in this case, the defendant who did not go to trial, Hip Wynn. They told him that Hip was a methamphetamine trafficker. He was a big methamphetamine trafficker. That he obtained large quantities, several pound quantities of methamphetamine from various sources, including a man named Richard Martinez. Also told the jury, and there was other evidence to corroborate this, that Mr. Martinez operated a clandestine methamphetamine laboratory on a street in the city of Garden Grove. That's the Flint Place methamphetamine laboratory that Judge Tolman referenced earlier. And in fact, there was surveillance evidence showing Mr. Hip Wynn picking up narcotics, or presumably picking up narcotics based on the intercepted telephone conversations from the Flint Place methamphetamine laboratory in August of 2002, right in the heart of these methamphetamine transactions that were evidenced by the wiretap evidence. So the jury heard all of that as background evidence in the intercepted wiretap telephone calls between Hip Wynn, on the one hand, and Mr. Au, Mr. Dang, and Mr. Tran, on the other hand. Let me address briefly Mr. Melcher's contention about the three pound deal that his client discussed with Mr. Wynn on August 22nd, because I think it's illustrative. On August 22nd, Nathan Dang had a conversation with Hip Wynn, and I'll condense it down, it basically went like this. Hip Wynn said, I have three left. Is it as good as the rest? Three big ones, yes. Same ones, yes.  I'll ask around for you, cousin. Now, Mr. Dang argues, and Mr. Au makes essentially the same argument, no evidence the deal was ever consummated. And the government submits, your honors, it doesn't matter. If I were to agree with Mr. Lesser, back here, to try to find a buyer for his three pounds of methamphetamine. What about your three pounds? Well, if Mr. Lesser were to talk to me, to try to find a buyer for my three pounds of methamphetamine, we've conspired to distribute methamphetamine, and it's reasonably foreseeable to Mr. Lesser that I have three pounds of methamphetamine, or I can get three pounds of methamphetamine to sell to him. Now, contrast, to take a radical example on the other side, I ask Mr. Lesser to find buyers, and he says, oh, I don't do that, or I can't do that, or I'm not interested in that. Now, Mr. Melcher argues that the subsequent call of about a month later, in which Mr. Dang complains he didn't get any drugs, shows that the deal was never consummated. Well, to some extent, that ratifies the earlier conversation. It says, you know what, you stiffed me last time around. You had all these girls, and you couldn't even leave half a girl for your poor cousin Nathan. Your honors, that was the evidence the jury heard, and that transaction, that three-pound transaction, plus the one-pound transaction that took place five days earlier, four pounds sufficient for the jury to find in Mr. Dang's case that he was responsible for more than 1.5 kilograms of methamphetamine. I could detail, if it's helpful for the Court, the same kind of evidence for Mr. Au and Mr. Tran. It's fairly well set out in detail in the government's answering brief, so I don't want to take up too much of the Court's time if it's not necessary. We did not touch on any of the other three issues raised by the defendants in their briefs. If the Court has any questions about any of those, I'm happy to address those now. What were the overt acts that were committed? What were the overt acts? Well, first, your honors, of course, for 846 liability, the government does not have to prove any overt acts, but the government would argue that the overt acts were the agreements or the telephone conversations, evidence on the telephone. A conversation in which you and I discuss the disposition of methamphetamine or negotiate the price for methamphetamine, that could be an overt act. That's what was alleged in the indictment. We allege overt acts in our indictments in the Central District. If there's nothing further, the government submits on the briefs. Thank you very much. All right. I want a couple minutes to... How about Mr. Melchior? He doesn't get all the time. If you got three Melchiors, they ought to get at least three more minutes. I'm trying to remember that joke that I heard once. I can't remember it, though. A guy calls up this law firm of, say, Melchior and Melchior and Melchior and Melchior, and says, I'd like to speak to Joe Melchior. Well, he's retired. He's no longer here. Then he says, well, how about Jack Melchior? Well, he's out playing golf. Well, how about George Melchior? Well, he's out to lunch. Well, how about Jason Melchior? Speaking. I don't know. Somebody told me once. It's much better than that. Well, the court certainly has an even greater sense of humor than it did when it swore me in personally in your chambers in 1978, I think. I'll never forget that either. Where's your office? Well, I'm right now on... It used to be at 21-800 Oxnard. That's where I am. I know. We were right next door to you. On the ninth floor, I believe. Top floor. Eleventh floor. Eleventh floor. But at that time, I was with Steinberg and Bugliosi. That's Vince Bugliosi in Beverly Hills. Just left the district attorney's office. I see. I'm very pleased before the court again today. You were there about the time my brother was there. Yes, I believe so. I do distinctly remember being sworn in by you. You look very familiar. The court has a good memory. Bring the other ones around. I sure will. Make it a family function. Well, certainly, Mr. McCormick is very well-prepared and very persuasive, I think, with regard, though, to the one point that I raised. With regard to that three pounds, and I'll sit down on this. I think he doesn't address Gibbs, the Third Circuit case. And Gibbs addressed it. Gibbs, of course, should be persuasive. And Gibbs mentioned, I think it was a two- or three-year-old case. Gibbs had mentioned that it had not then found any case such as this where, based on the interceptions alone and where you had a simple inquiry as to price, that there was any conduct that was liable to prosecution or successfully liable to prosecution. I don't even see a conspiracy here to begin with in this entire case. We talked about Mr. McCormick and Mr. Lesser selling methamphetamine. It seems to me this whole case, everybody's selling amphetamine in the Vietnamese community in this area. All of these people were involved in some fashion or another, perhaps, or at least are alleged to be. And it seemed to be such a loose kind of confederation. It's almost like me going to Nordstrom's and buying a shirt. It doesn't mean I'm conspiring with Nordstrom's to sell shirts. I simply went to Nordstrom. And in this particular case, Mr. Dang had gone to his cousin and simply asked about price. I just don't see with 10,000 or 18,000 interceptions here and with an extremely difficult transcript with regard to the slang and the northern and southern Vietnamese dialects and all of that, with many words meaning many things, and then you had to worry about what a girl meant and all that. It's a very, very loose kind of conspiracy that's even alleged. But I think we've made our point. And what was this considered? It was a wheel conspiracy. A real one? Wheel. A wheel. Wheel. I don't know what a wheel conspiracy is. It was pretty big, apparently. You know, my grandson says wheel. Like, in the wheel world, we do this and that. That's the only way I can interpret it. Well, I'll wait to swear him in, too. How old is he? He's six. Well, he's still got time. Yeah, well, I'm more interested in baseball at the moment. I've got a major league cousin, Jeff Soupon, who pitches for the Cardinals, so that's his role model, not me so much. It's not bad, though. No, not bad at all. Thank you so much. Let me ask the guard about it. Was this a wheel conspiracy? Well, Your Honor, it was more complicated than just a single guy at the center with a bunch of spokes coming out from it. I mean, he had. How do you tie the other conspirators together? Essentially, if you're just talking about these three defendants, it's essentially Mr. Wynn at the top and then the three of them below him. Essentially, I guess, CEO and then sort of three different vice presidents in charge of sales and distribution for various regions or markets or what have you. So did those three have conversations among them? Among the three of them, no. Well, Mr. Wynn was looking into the three of them and relied on the three of them to assist him in disposing of these large quantities of methamphetamine. He didn't rely on just one of them. He would talk to both of them or all three of them sometimes and say, I've got some, I've got three, I've got four, I've got five. Can you help me? Can you move it? I'll talk to people. He relied on all. More of a horizontal conspiracy in an antitrust sense than a vertical conspiracy. Is that what you're saying? Maybe we shouldn't have got off on the structure here. It is a little bit of a tangent, but, yeah, I think what we have here with respect to these three defendants and Mr. Wynn, we have Mr. Wynn at the top disposing methamphetamine down separately and apart. They don't relate to each other. They're to some extent. So each of the three lieutenants had their own distribution network? Had their own distribution networks or distribution opportunities or they would broker transactions. They would find people to buy the methamphetamine from Mr. Wynn. And none of the three lieutenants had contact with each other? Well, they had. There may have been some incidental contact. Well, I mean on your. On our conspiracy in terms of our evidence, no. I think the three of them probably knew each other, had bumped into each other as Mr. Wynn's colleagues, but they weren't. They may have gone to the same coffee shop to bump into Mr. Wynn, but they didn't sell drugs to and fro each other. Or at least there was no evidence. Did each of them know that they were being supplied by Mr. Wynn? There was no evidence of that, Your Honor. There was no evidence that Mr. Al, for instance, knew that Mr. Dang was obtaining methamphetamine from Mr. Wynn. And that wouldn't have been necessary. But what you had here were three separate conspiracies. Well, what you had is one conspiracy run by Mr. Wynn in which he disposed of methamphetamine through a various number of brokers and distributors, these three defendants. And when Mr. Wynn fell out of our trial on the morning of trial, we were left with these three defendants to go to trial with. So we had to prove essentially a conspiracy involving four people. Well, really five people because we also proved Mr. Martinez was involved. But none of them, none of the lieutenants, you didn't prove any conspiracy between Lieutenant One, Lieutenant Two, or anything like that, did you? No, Your Honor. So you actually had, if you look at those three, you had three separate conspiracies. I suppose the evidence of their involvement with Mr. Wynn was separate, but it was all one methamphetamine trafficking conspiracy. It was Mr. Wynn's trafficking conspiracy. Well, if it's all one, then you have to, don't you have to connect one, two, and three to each other? Well, let's go back to Your Honor's original question which got us here, which was the wheel. If there's one person in the middle of the wheel and three different spokes coming off of it, that's a conspiracy. But you have to show, you have to show the rim. I don't think that's correct, Your Honor. Are you sure about that? What we need to show is an agreement between two or more persons to distribute methamphetamine. But you only show an agreement. You've got two people. You've got three separate conspiracies. You don't have one. You've got three separate conspiracies. Look, I had a trial once involving Tootie Reese. You know Tootie? I don't know Tootie. Well, you'd have liked Tootie, but he wasn't such a good guy. And it was tried by the office in Los Angeles. And it was, you know, you had Tootie in the middle and you had all these other people out there, see? And you had to show that each one of them was connected.  And the government didn't do that. And the prosecutor's name was Haas. He didn't do it. He blew the whole thing. And it was a no-drug drug case, too. It's interesting, isn't it? I'm the institutional memory around here. But that's really a variance issue, isn't it? Not a sufficiency of the evidence issue. Well, I guess, Your Honor, it would be if there was some concern that the government had not proved a linkage between the various people on the outside. And that would be an attack on the variance between the theory that was alleged in the indictment versus what the proof actually showed at the trial. Correct. And nobody's raising a variance challenge here. The challenge is to the sufficiency of the evidence as it relates to each of the three. And the quantities here, where the quantities is related to each individual. Correct. It's the quantity on each spoke. But you have three different conspiracies. Again, I'm going to agree to disagree with you, Your Honor. And you've got to bring the rim in. I agree to disagree with Your Honor, but to be clear about two things. One is it's a challenge to the sufficiency of the drug quantity finding. And that is simply the quantity of drugs that went from the center or the top, Mr. Winn, down each rung or spoke to each of these defendants. And we didn't aggregate. We didn't try to hit these defendants with the other amount. So we didn't try to hit Mr. Al, for instance, with Mr. Dang or Mr. Transel. That's what I just said. So you've got three different conspiracies. Without the government. If you had a wheel conspiracy, if you had one conspiracy, you would charge them with all three quantities. Think about that. I will, Your Honor. And send me a note on what you find more confidential for your eyes only. All right, Your Honor. Thank you. Is that it? Yeah. Ask people in your office to remember that case because that could be the subject of a wonderful book. And then they finally were able to convict Mr. Reese. And he used to drive in the parking lot across the street every morning with all his people. They all drove Rolls Royces. And after he was convicted and sent to prison and all his vehicles were impounded, then Sam Cicchino, who was the chief deputy marshal, when Tudy had to come back for a sentence hearing, Sam would drive to the prison at Terminal Island, pick up Tudy, put him in the back of his own Rolls Royce and drive him back to the courthouse. And Tudy would say, Sam, you sure know how to hurt a guy. Oh, yeah. And if I were Bookley O.C., I'd write a book on it. Yeah. All rise. This court for discussion stands adjourned. Thank you. Thank you.
judges: Pregerson, Thompson, Tallman